IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA SHIFT, | * | |
| | * | |
| Plaintiff, | * | CIVIL ACTION NO. |
| | * | 1:19-cv-01135-AT |
| v. | * | |
| | * | |
| GWINNETT COUNTY, | * | |
| FULTON COUNTY, | * | |
| DEKALB COUNTY, and | * | |
| COBB COUNTY, | * | |
| | * | |
| Defendants. | * | |

**BRIEF IN SUPPORT OF MOTION TO DISMISS COMPLAINT ON
BEHALF OF DEFENDANT COBB COUNTY**

COMES NOW Defendant Cobb County, and, pursuant to Fed. R. Civ. P.

12(b)(1) and 12(b)(6), submits this Brief in Support of Dismissal, showing this

Honorable Court as follows:

## I.  INTRODUCTION

Plaintiff Georgia Shift – a civic organization aimed at giving young people

a "seat at the table of democracy" – brings this § 1983 federal suit against

Gwinnett, Fulton, Dekalb, and Cobb Counties claiming the Counties failed to

provide their respective Boards of Elections with "the necessary tools" for running

a proper 2018 Election and Plaintiff assumes this will recur in 2020.  While these

allegations may capture headlines, this action cannot withstand legal scrutiny.

Georgia Shift's injury is purely speculative in that it anticipates hypothetical mismanagement of an election that is over a year away. The 2020 Election will involve voting equipment that has never been used, a county budget that has not been yet adopted, and decisions on staffing and the equipping of polling places that have yet to be made by the County's Board of Elections. Moreover, even assuming Plaintiff had pled facts plausibly suggesting likely mismanagement of the 2020 Election, Cobb County government is not the legal entity capable of forestalling projected problems.  Plaintiff's factual allegations do not – and cannot – contest the reality that state law vests authority for managing elections with the County's Board of Elections, over which the County's Board of Commissioners has no control.

For these reasons, and those fully briefed herein, Georgia Shift lacks standing to pursue this action and, even if it had standing, the Complaint fails to state a claim against Cobb County.  This action should be dismissed.

## II.  STATEMENT OF FACTS

### A.  Statutory Background to Election Law.

The Cobb County Board of Elections & Registration ("Cobb BOE") is created by state law and is statutorily empowered "with the powers and duties of the election superintendent relating to the conduct of primaries and elections and

2

with the powers and duties of the board of registrars relating to the registration of voters and absentee-balloting procedures." O.C.G.A. § 21-2-40(b).   A county board of elections and registration, like Cobb BOE, is specifically defined to be a "superintendent" under Georgia election laws. O.C.G.A. § 21-2-2(35).  State law establishes the power and authority of superintendents to manage elections. O.C.G.A. § 21-2-70(1)-(15).   The statutorily enumerated duties of the superintendent include: selecting and equipping polling places; appointing poll officers; making and issuing rules and regulations consistent with State law and with the regulations of the State Election Board; hiring and training poll officers; purchasing voting supplies; and preparing a budget estimate of expenses to be submitted to the county governing authority. O.C.G.A. § 21-2-70(4), (5), (6), (7), (8) & (12).

The qualifications to serve on county boards of election are established by State law. O.C.G.A.  § 21-2-76; § 21-2-214.  Superintendents are required to attend State-mandated training and can be fined by the State Election Board for failure to attend such training.  O.C.G.A. § 21-2-100(a), (e).  State law mandates numerous details regarding a county election board's performance of its statutory duty to manage elections, including the minimum compensation that must be paid to poll officers (O.C.G.A. § 21-2-98), the minimum number of poll officers at a

precinct (O.C.G.A. § 21-2-90), and the procedures governing voter registration and absentee ballots.  O.C.G.A. § 21-2-215, § 21-2-219, § 21-2-220, § 21-2-383.

This month the Governor signed House Bill 316, which makes significant changes to the Election Code.  2019 Georgia Laws Act 24 (H.B. 316).  One such change is that it institutes a new Statewide Voting System to replace the aging Direct Recording Electronic voting equipment ("DREs") that were used state-wide in the 2018 election.  The new equipment will use electronic ballot markers and ballot scanners to provide touchscreen-marked paper ballots.  O.C.G.A. § 21-2-300(a)(1)&(2).  The State is required under the new law to "furnish [the] uniform system of ballot markers and ballot scanners for use in each county as soon as possible."  O.C.G.A. § 21-2-300(a)(3).

County governing authorities do not administer or supervise elections occurring within their counties. As explained above, the Election Code makes clear that it is superintendents, (i.e., county boards of elections), which are charged with the management of elections and registration of voters under the authority and control of state law.  Georgia law requires the governing authority of each county or municipality to "appropriate annually and from time to time, to the superintendent the funds that it [the superintendent] shall deem necessary" for running the election.  O.C.G.A. § 21-2-71.

**B.  Facts Regarding Cobb BOE's Management of the Election.**

The Cobb BOE consists of a 5-person Board, whose members are appointed for 4-year terms.[1] (Declaration of Janine Eveler at ¶ 4 [hereinafter "Eveler Decl."]).[2]   The Cobb BOE staff, which consists of 26 full-time employees and 18 part-time positions, manages the daily operations of the Cobb BOE. (Eveler Decl. at ¶ 5).  Many of the decisions regarding the management of an election are made at the staff level, such as the hiring and training of poll officers, the allocation of voting equipment to polling places, and the number of poll officers assigned to a particular precinct.  (Eveler Decl. at ¶ 6)

The Cobb County Board of Commissioners ("the BOC"), which is the governing authority for Defendant Cobb County, has no authority or control over Cobb BOE's discretionary determinations as to how to manage the election.  As noted above, Cobb BOE manages the election consistent with the directives of state law and regulations, which are administered by the Secretary of State's

---

[1] Two of the Board members are appointed by Cobb legislative delegations; one is appointed by the Democratic Party; one is appointed by the Republican Party; and one is appointed by the Cobb County Commission chairman. (Eveler Decl. at ¶ 4)

[2]  The Court may consider documents extrinsic to the pleadings in determining a jurisdictional issue, such as standing. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)

Office and the State Election Board.  Pursuant to state law, the BOC's primary role in an election is simply to appropriate funding to Cobb BOE for the purpose of running the election.  O.C.G.A. § 21-2-71.  Cobb BOE is required by state law to submit a budget request to the County, and the County is required by state law to appropriate funds to Cobb BOE.  O.C.G.A. § 21-2-70(12); § 21-2-71.  It is Cobb BOE, and not the County, that determines how those funds will be spent. O.C.G.A. § 21-2-71. The Cobb BOE Director has testified that the BOC has always appropriated all necessary funds for Cobb BOE to properly manage the election.  (Eveler Decl. at ¶¶ 12, 15).

In the current fiscal year (FY 2019), which applied to the 2018 election, the BOC initially approved a budget of $3.7 million for Cobb BOE. (Eveler Decl. at ¶ 13).  In the November 2018 election, Cobb BOE exceeded this appropriation and spent an additional $766,975 in November and December of 2018, most of such funds being used to hire additional poll workers and to pay costs associated with the runoff. (*Id.*)  In February 2019, the BOC authorized a payment to reimburse Cobb BOE for the additional $766,975 and also authorized an additional appropriation of $269,000 for capital improvements to Cobb BOE's Headquarters. (*Id.*)  Thus, Cobb BOE's total FY 2019 budget ultimately totaled $4,768,921. (*Id.*)  Given that the initial $3.7 million budget was exceeded during

the 2018 election, Cobb BOE intends to seek approval from the BOC for a higher $4.7 million budget for FY 2020. (*Id*. at ¶ 15).  The BOC has tentatively scheduled three public hearings in July 2019 on the proposed FY 2020 budget for Cobb County and plans to vote on the budget immediately following the last public hearing, which will occur on or around July 23, 2019. (*Id.*).  Thus, no FY 2020 budget has yet been approved.  The Cobb BOE Director, however, has testified that based on past experiences, she believes that it is likely that her higher budget proposal will be approved and that, as in previous years, Cobb BOE will have the funding that it needs to properly manage the election.  (*Id.*).

About 3-4 months before an election, the Cobb BOE Director meets with her three Cobb BOE managers, and they make a series of discretionary decisions regarding the management of the election, such as the number and location of early voting sites, the staffing of precincts, and the distribution of voting equipment. (*Id.* at ¶ 14).  These decisions are further refined closer in time to the election when Cobb BOE has better information on projected turnout and can have a better understanding of whether a campaign is energizing the public.  Cobb BOE cannot hire poll workers far in advance of an election because the very nature of temporary or seasonal positions is that employees do not know their availability until close in time to the event.  Thus, none of those decisions have yet been made

for the 2020 election.  (*Id.*)

### C. Allegations in the Complaint

Plaintiff, a voting rights organization, has asserted claims against Gwinnett, Fulton, Dekalb, and Cobb Counties under 42 U.S.C. § 1983 alleging that Defendants have violated the Fourteenth Amendment by imposing undue burdens on the right to vote. (Doc. 1 at ¶¶ 16-19).  The lawsuit is based on allegations that the November 2018 elections in the four counties were "plagued with problems" that Plaintiff assumes will recur in the 2020 elections. (*Id.* at ¶¶ 10, 14, 17). Plaintiff alleges the following problems with the 2018 election: "a lack of polling places, a lack of sufficient voting machines, voting machine malfunctions, inadequate supplies of provisional ballots, [and] inadequate amounts of staff," all of which Plaintiff alleges resulted in "unreasonably long lines on Election Day." (*Id.* at ¶ 11).  Plaintiff also alleges that staffing shortages resulted in "inordinate delays" in the processing of voter registration forms, absentee ballot applications, and returned absentee ballots. (*Id.* at ¶ 12).  Based on these alleged problems, Plaintiff claims that it has been harmed because it has had to divert its resources "away from activities that seek to increase voter turnout, towards ensuring that the current system can even handle the existing level of turnout." (*Id*. at ¶ 8).

Plaintiff's Complaint acknowledges that county boards of election are

"charged with the responsibility of running the day-to-day operations of elections" (Doc 1 at ¶ 2) but alleges that the Counties have failed to provide the county boards of election "with the tools necessary for the Boards of Election to do their jobs." (*Id*. at ¶ 4). While the Complaint does not clearly identify what is meant by the word "tools" in Paragraphs 4, 14, and 17, the Complaint alleges in Paragraph 3 that the Counties "have failed to provide the Boards of Election enough polling places, voting machines, and elections staff in recent elections." (*Id*. at 3).

By way of relief, the Complaint seeks an injunction requiring the County Defendants to "take all necessary actions in advance of the 2020 elections to protect voters by reforming and improving their election procedures to comply with the Fourteenth Amendment and applicable laws . . ." (Doc 1, p. 8, Prayer for Relief (b)). The Prayer for Relief requests that the injunction include a requirement that the County Defendants "publicly announce the steps taken to provide sufficient resources for the Boards of Election to run a proper election in 2020" and "any other such action that may be necessary to not burden voters and their right to vote." (*Id*.). Finally, Plaintiff's lawsuit asks this Court to order the Defendants "to provide enough polling places, voting machines, and elections staff to prevent voters from having to wait in unreasonably long lines on Election

Day" and to provide staffing to allow elections officials to process registration

forms and absentee ballot applications within one day of receipt. (*Id.* at (c)).

## III. ARGUMENT & CITATIONS OF AUTHORITY

### A. Motion to Dismiss Standard Under Rules 12(b)(1) & 12(b)(6)

A lawsuit is subject to dismissal under Rule 12(b)(1) for lack of subject

matter jurisdiction. Challenges to jurisdiction under Rule 12(b)(1) come in two

forms: facial attacks and factual attacks. 5*th Bedford Pines Apartments, Ltd. v.*

*Brandon*, 262 F.Supp.2d 1369, 1374 (N.D. Ga. 2003). The two forms of

jurisdictional attack "differ substantially." *Lawrence v. Dunbar*, 919 F.2d at 1529.

"Facial attacks on the complaint require the court merely to look and see if the

complaint has sufficiently alleged a basis of subject matter jurisdiction, and the

allegations in the complaint are taken as true for the purposes of the motion." *Id.*

(internal citations omitted). Factual attacks, on the other hand, "challenge the

existence of subject matter irrespective of the pleadings, and matters outside the

pleadings, such as testimony and affidavits [may be] considered." *Id.* (internal

citations omitted). "'[N]o presumptive truthfulness attaches to plaintiff's

allegations, and the existence of disputed material facts will not preclude the trial

court from evaluating for itself the merits of jurisdictional claims.'" *Id.* (internal

citations omitted).

A lawsuit is subject to dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. To state a claim, a "complaint must include 'allegations plausibly suggesting (not merely consistent with)' the plaintiff's entitlement to relief." *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1334 (11th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The court is to assume all well-pleaded facts are true and give the non-movant the benefit of all reasonable inferences. *Harper v. Perkins*, 459 F. App'x 822, 824 (11th Cir. 2012). Importantly, however, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "Naked assertions without further factual enhancement and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Sparks v. Bell,* 639 F. App'x 617, 618 (11th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))**.**

## B. This lawsuit should be dismissed for lack of jurisdiction because Plaintiff cannot demonstrate standing.

Article III of the Constitution restricts judicial power "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492, 129 S.Ct. 1142, 173 L.Ed.2d 1

(2009).  "Standing doctrine 'reflect[s] this fundamental limitation' and 'requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant . . . invocation of federal court jurisdiction.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018) (quoting *Summers*, 555 U.S. at 492).  This limitation is "founded in concern about the proper – and properly limited – role of the courts in a democratic society." *Summers*, 555 U.S. at 492.

The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).  Standing elements are "not mere pleading requirements, but rather an indispensable part of the plaintiff's case," and the manner and degree of evidence required to demonstrate the existence of standing varies depending upon the stage of the litigation.  *Ga. Republican Party*, 888 F.3d at 1201.  At the pleading stage, the plaintiff is only required to provide "general factual allegations of injury" [*Id.*]; however, those allegations must nevertheless contain sufficient detail for the Court to determine that plaintiffs "have made factual averments sufficient, if true, to demonstrate injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378 (1982) ("extreme generality" of allegations in the complaint prevented Court from determining whether standing had been demonstrated).

To satisfy the burden of demonstrating standing, the plaintiff must plead specific facts showing that (1) "the plaintiff has suffered an 'injury in fact' – an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there [exists] a causal connection between the injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 137 L.Ed.2d 281 (1997).

An organizational plaintiff may make this three-pronged showing under two alternative theories: (1) the "diversion-of-resources theory" in which the organizational plaintiff asserts standing on its own behalf by alleging facts showing that the defendant's allegedly "illegal acts impaired the organization's ability to engage in its own projects by forcing the organization to divert resources in response"; and (2) the "associational theory" in which the organizational plaintiff asserts standing in a representational capacity for its members where "the members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the

lawsuit." *Arcia v. Sec'y of Florida*, 772 F.3d 1335, 1341-1342 (11th Cir. 2014).
*See also Greater Birmingham Ministries v. Merrill,* 250 F. Supp. 3d 1238, 1242
(N. Dist. Ala. 2017) (describing these theories as "distinct, alternative theories for
organizational standing").

Plaintiff's Complaint relies solely on the "diversion of resources" theory to
prove standing. (Doc. 1, ¶ 8). It alleges that because of the Defendant Counties'
alleged failures in providing unspecified "tools" to the county election boards
necessary to run an election, Plaintiff must now divert resources "away from
activities that seek to increase voter turnout, towards ensuring that the current
system can even handle the existing level of turnout." (*Id.*). As discussed below,
these bare-bone conclusory allegations concerning the unspecified future
diversion of its resources do not come close to providing sufficient factual
allegations to survive a motion to dismiss for lack of standing.

1. *Plaintiffs Have Not Demonstrated an Injury in Fact.*

In *Havens Realty v. Coleman*, 455 U.S. at 379, the Supreme Court
established the principle that an organization's diversion of resources in response
to a defendant's allegedly illegal conduct could constitute "injury in fact" for
purposes of demonstrating standing. That case considered whether a nonprofit
housing organization had standing to sue an apartment complex for alleged

violations of the Fair Housing Act.  In holding that the organizational plaintiff had standing, the Court concluded that the defendants' racial steering practices had "perceptibly impaired [plaintiff's] ability to provide counseling and referring services for low and moderate-income home-seekers," thus resulting in a concrete injury-in-fact to the organization.  *Havens Realty*, 455 U.S. at 379.   The Court, however, made clear that it was necessary to allege a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources" – and that "a setback to the organization's abstract social interests" was *not* to sufficient to demonstrate an injury in fact for purposes of standing.  *Id.*

Since *Havens*, federal courts addressing organizational standing have examined whether a lawsuit alleges that a defendant's conduct resulted in actual or imminent harm to the organization by forcing it to divert resources from other projects and interfering with its normal daily activities.  "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of the organization's daily operations." *Food & Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  The courts have been clear that a "conflict between a defendant's conduct and [an] organization's mission is alone insufficient to establish Article III standing." *Nat'l Treasury Employees Union v.*

15

*United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996). *See also Clark v. Burger King*, 255 F. Supp.2d 334, 344 (D. N.J. 2003) ("an organization does not possess standing simply because it has an ideological or abstract social interest that is adversely affected by the challenged action.")

Federal circuits around the country, including the Eleventh Circuit, have emphasized that costs associated with litigation, including identifying witnesses and potential violations, are *not* injuries for purposes of conferring standing because they do not involve harm to the daily operations of the entity: "[P]laintiffs cannot bootstrap the cost of detecting and challenging the illegal practices into injury for standing purposes." *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008). *See also NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) ("Not every diversion of resources to counteract defendant's conduct . . . establishes an injury in fact . . . '[T]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."); *Food & Water Watch*, 808 F.3d at 919 ("an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury.")

Two "key factors" in determining whether an organizational plaintiff has demonstrated standing under a diversion of resources theory are "whether the injury relates to the organization's mere advocacy objectives," which is *insufficient* to confer standing, or "if instead, it undermines the organization's direct, non-advocacy services," which *would* demonstrate injury-in-fact.   *Int'l Acad. Of Oral Medicine & Toxicology,* 195 F. Supp. 3d 243, 256 (D.D.C. 2016). "Another [key factor] is whether the organization truly 'diverted' any resources at all; in other words, did the challenged agency action cause it to incur 'operational costs beyond those normally expended' to carry out its day-to-day mission of educating the public or advancing its advocacy mission?" *Id.*

Application of these legal principles to the facts of this case demonstrates that this Complaint fails to allege facts to show an injury-in-fact sufficient to confer federal jurisdiction.  Plaintiff has not submitted any Declarations with its Complaint to show injury to the organization's operations and non-advocacy services, and the two generalized assertions in Paragraph 8 do not come close to meeting the pleading standard required to demonstrate that standing exists.

To survive this Motion, the Complaint must contain *specific* allegations showing actual or imminent harm to Plaintiff's day-to-day operations.  In *City of Kyle*, the Fifth Circuit held that organizational standing was lacking in a lawsuit

challenging municipal ordinances because plaintiffs had "not identified any specific projects that [plaintiffs] had to put on hold or otherwise curtail[ed] in order to respond to the revised ordinances." *City of Kyle*, 626 F.3d at 238. The Court explained that plaintiffs had only "conjectured" that the resources that they "had devoted to the revised ordinances could have been spent on other unspecified . . . activities," and, therefore, the plaintiffs had "not demonstrated that the diversion of resources [there] concretely and 'perceptibly impaired' [plaintiff's] ability to carry out its purpose." *Id.* at 240 (quoting *Havens Realty*, 455 U.S. at 379).

The Court in *City of Kyle* explained that its holding was consistent with the Eleventh Circuit's ruling in *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) where organizational standing *was* held to exist because "'plaintiffs ha[d] averred that their actual ability to conduct *specific* projects during a *specific* period of time" had been frustrated by defendant's enforcement of an allegedly unlawful voting requirement. *City of Kyle*, 626 F.3d at 239 (quoting *Browning*, 522 F.3d at 1166). In *Browning*, the organizational plaintiffs had alleged concrete harm to their day-to-day operations, such as their staffing of voter registration drives and language translation services, because the organizations needed to shift resources towards educating voters on how to

comply with the allegedly unlawful law.  *See also Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F. 3d 1250, 1260 (11th Cir. 2012) (injury shown under diversion of resources theory based on allegations that Plaintiff had cancelled citizenship classes and curtailed existing programs); *Greater Birmingham Ministries v. Merrill*, 250 F. Supp. 3d at 1243 (standing shown where group had to expend "significant resources" educating and assisting voters in how to comply with challenged photo ID law.)

The allegations in this case stand in stark contrast to those in *Browning*, *Georgia Latino Alliance*, and *Greater Birmingham Ministries*.  Whereas the plaintiffs in those cases pled facts showing the defendants' alleged unlawful conduct *drained resources and impeded the group's ability to function normally*, Plaintiff here vaguely asserts harm and diversion of resources, without providing a single specific factual allegation regarding effects on its routine operations. Plaintiff alleges that "activities that seek to increase voter turnout" (Doc 1 at ¶ 8) have been affected by its alleged diversion of resources, but it does not identify a single specific activity.  This allegation is thus insufficient for the same reason that standing was lacking in *City of Kyle*.

Moreover, the Complaint contains no allegations as to where its resources are now being channeled.  Plaintiff alleges vaguely that it is diverting its resources

into efforts to "ensur[e] that the current system can . . . handle the existing level of turnout." [Doc. 1 at ¶ 8].  However, with the exception of filing this lawsuit, it is not clear what efforts, if any, Plaintiff has made in that regard, and the Complaint contains no allegations concerning any such efforts.  Without any factual specifics, it is impossible for this Court to determine whether the alleged areas of diversion were already part of the Plaintiff's normal operations.  In order to qualify as an injury-in-fact, the organization's expenditures must be for "operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920.  Standing was found lacking in the *City of Kyle* case not only because the plaintiffs had failed to identify specific projects that had been impacted, but also because the alleged diversion of resources related to "examining and communicating about developments in local zoning and subdivision ordinances," which the Fifth Circuit held to be part of the plaintiffs' "routine lobbying activities." *City of Kyle*, 626 F.3d at 238.  *See also PETA v. United States Dep't of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("Nor is standing found when the only 'injury' arises from the effect of the regulations on the organization's lobbying activities"); *Goldstein v. Costco Wholesale Corp.*, 278 F. Supp. 2d 766, 770 (E.D. Va. 2003) ("Ordinary programming costs are insufficient to establish an injury in fact.").

The lack of any detail also makes it impossible for this Court to distinguish between alleged adverse effects on Plaintiff's pre-litigation normal operations, which could give rise to an injury-in-fact, and effects related to the instant litigation-oriented activities, which cannot constitute injury for purposes of standing.   "An organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing."  *PETA*, 797 F.3d at 1093.  *See also Browning*, 522 F.3d at 1166.  *See Nat'l Consumers League v. General Mills*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) (declining to find Article III standing where the organization plaintiff "has merely chosen to devote its resources to challenge [defendant's] conduct by filing this suit, much like 'the self-inflicted harm' of challenging a regulation.")

Finally, Plaintiff has not alleged a cognizable injury-in-fact based on diversion of resources because the allegations are based on future harm that is highly speculative and uncertain.   While anticipated future harm can confer standing, provided it is imminent and reasonably likely to occur, *Browning*, 522 F. 3d at 1160-1161, Plaintiff includes no factual allegations to show that these unidentified impacts on their unidentified programs satisfy the immediacy and likelihood requirements.

"The Supreme Court has 'repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact' and that 'allegations of *possible* future injury' are not sufficient." *Ga. Republican Party*, 888 F.3d at 1202 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis in original). In *Ga. Republican Party*, 888 F.3d at 1202-1203, the Eleventh Circuit ruled that the state Republican Party did not have standing to challenge a federal rule that it vaguely claimed would "hinder the state party" by affecting fundraising on grounds that the Complaint and supporting Affidavit did not contain any specific factual allegations that *any individual* had declined to contribute to the party based on the regulation: "[T]he affidavit offers no facts to show that the Georgia Party will be significantly hinder[ed] in some way. In other words, the affidavit offers no facts to show that the Georgia Party's fundraising will actually be harmed. The affidavit's generalized allegations of *possible* future injury, without factual support, are not sufficient to establish *certainly impending* injury." *Ga. Republican Party*, 888 F.3d at 1203 (internal citations omitted).

The reasoning of *Ga. Republican Party* applies with equal force here: Plaintiff has failed to allege any facts showing a "certainly impending" future injury in connection with the 2020 election. The significant changes to the Election Code enacted this month further underscore the speculative nature of the

future harm.  The 2019 legislative changes to the Election Code institute a new Statewide Voting System, which will replace the DREs used in the 2018 election with new voting machines that create a touchscreen-marked paper ballot. O.C.G.A. § 21-2-300.  *See generally* 2019 Georgia Laws Act 24 (H.B. 316). Plaintiff cannot show a "certainly, impending" injury related to brand new voting machines that have never been used.  With regard to allegations concerning inadequate staffing, insufficient polling places, and insufficient quantities of voting machines at polling places, Cobb BOE has not made any of those decisions for the 2020 election and will not do so until closer to the election.  (Eveler Decl. at ¶ 15).  Thus, any allegations of "harm" based on decisions that have not yet been made are clearly premature and speculative.

### 2. The Injury Is Not Traceable to the County's Conduct and Would Not Be Redressed by an Order Directed to the County.

Even if Plaintiff had alleged a cognizable injury-in-fact, standing is still lacking here because it cannot demonstrate the second and third elements of standing: that Plaintiff's injury is traceable to the County Defendants' conduct and that it would be redressed by a favorable decision.

The "causation piece of Article III standing is vital." *Samuels v. Fed. Hous. Fin. Agency*, 54 F. Supp. 3d 1328, 1334 (S.D. Fla. 2014) (declining to find standing based on diversion of resources because it was not "fairly traceable to

the defendant's allegedly unlawful conduct").  Plaintiff's alleged injury is not fairly traceable to anything that Defendant Cobb County has done or failed to do. Plaintiff objects to the management of the 2018 election allegedly on grounds that there were insufficient polling places, an insufficient number of voting machines, broken voting machines, long lines, and delays in processing registrations and absentee ballots (Doc. 1, at ¶ 11); however, as discussed more fully below,[3] Defendant Cobb County exerted no control over any of these matters in the 2018 election and likewise will have no such control in the 2020 election.  *See* O.C.G.A. § 21-2-40 (Cobb BOE is vested with exclusive authority over management of elections, registration of voters, and processing of absentee ballots).  The Board of Commissioners' role is to appropriate to Cobb BOE the funds *requested by Cobb BOE pursuant to its authority under O.C.G.A. § 21-2-70(12)*.

Plaintiff's suggestion that Cobb County has somehow not adequately funded Cobb BOE is factually incorrect given that the Cobb County Board of Commissioners approved a total FY 2019 budget of $4,768,921 to Cobb BOE. (Eveler Decl. at ¶ 13)).  The BOE Director has testified that historically she has

---

[3] The lack of causation between Defendant Cobb County's alleged unlawful conduct (approval of a budget to Cobb BOE) and Plaintiff's alleged injury (election problems that create undue burden on the right to vote) is also why the lawsuit is subject to dismissal for failure to state a claim under § 1983.  *See* C, 2, below, at 31-35.

always received adequate and appropriate funding to run an election, and in the 2018 election when additional funds were needed, she spent what was necessary and received full reimbursement of those sums from the Board of Commissioners. (Eveler Decl. at ¶¶ 12-13).  However, even if one were to assume *arguendo* that $4.7 million dollars constituted inadequate funding, standing would still be lacking here because Plaintiff cannot show a nexus between Defendant's allegedly unlawful conduct (failing to appropriate sufficient funds) and Plaintiff's harm (a mismanaged election that burdened the right to vote).  Plaintiff may disagree with Cobb BOE's discretionary decisions regarding the number and staffing of polling places, its training of poll workers, and/or its maintenance of voting equipment, but it cannot show that a causal link exists between those decisions and the level of funding, or that additional funding would change any of Cobb BOE's decisions.

Related to this lack of causation, Plaintiffs' lawsuit also fails to demonstrate the third prong of standing (redressability) because Plaintiff cannot show that a favorable ruling as against Cobb County would provide Plaintiff with any relief. An Order directing Cobb County to appropriate additional funds to Cobb BOE would not control Cobb BOE's discretionary decisions regarding the management of the election or the expenditure of those funds.  Defendant Cobb County has no legal authority to require Cobb BOE to spend its funds in the manner preferred by

Plaintiff. *See Griffies v. Coweta County*, 272 Ga. 506, 508 (2000) ("[A]lthough the county commission has the power and duty to issue a budget, the county commission may not dictate to the clerk of superior court how the budget will be spent in the exercise of her duties.")  *See also Chaffin v. Calhoun*, 262 Ga. 202, 203 (1992).

## C.  Even if Plaintiff had alleged sufficient facts to demonstrate standing, the Complaint fails to state a claim.

Even if Plaintiff had alleged sufficient facts to demonstrate standing, Plaintiff's lawsuit should nonetheless be dismissed for failure to state a claim because, as discussed below, Cobb County cannot be liable under § 1983 for constitutional violations caused by Cobb BOE's alleged mismanagement of an election.

### 1. *Law governing liability of counties under § 1983.*

Government entities may be held liable under § 1983 only for the execution of a governmental policy or custom that violates the plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  "'A policy is a decision that is officially adopted by the municipality or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.'"  *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489

(11th Cir. 1997). "A custom is a practice that is so settled and permanent that it takes on the force of law." *Id.*

In addition to identifying an allegedly unlawful policy or custom, the plaintiff must also show that this policy or custom *caused* the constitutional violation at issue. "The causation chain is an important aspect of *Monell* cases and the policies underlying *Monell* liability." *Vandiver v. Meriwether County, Georgia*, 325 F. Supp.3d 1321, 1332 (N.D. Ga. 2018). "Courts must be mindful to ensure that municipal liability is predicated upon an act traceable to the County itself . . ." *Id.*

Finally, Plaintiff must show that the county has "authority and responsibility over the governmental function in issue" and "must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Grech v. Clayton County*, 335 F.3d 1326, 1330 (11th Cir. 2003). "[L]ocal governments can never be liable under § 1983 for the acts of those whom the local government has no authority to control." *Turner v. Jefferson Cnty., Ala.*, 137 F.3d 1285, 1292 (11th Cir. 1998) (*en banc*). In analyzing the issue of control, courts must consider "*the particular area or function* for which the governmental official was alleged to be the final policymaker." *Grech*, 335

F.3d at 1331 (citing *McMillian v. Monroe County*, 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)) (emphasis added).

Supreme Court authority makes clear that "whether a particular official has final policymaking authority for § 1983 purposes is a matter of state law." *Owens v. Fulton Cty*., 877 F.2d 947, 950 (11th Cir. 1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *Pembaur v. Cincinnati*. 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). "Whether an individual or entity possesses final policymaking authority is thus a question of law for the Court" that is "resolvable at the motion-to-dismiss stage." *Casey v. Clayton Cty*, 2007 WL 788943, (N.D. Ga. 2007) (citing *Scala v. City of Winter Park*. 116 F.3d 1396, 1399 (11th Cir. 1997)); *Vandiver*, 325 F. Supp.3d at 1329.

As discussed below, application of this settled law demonstrates that Cobb County is not liable as a matter of law under § 1983. The alleged unlawful policy or custom at issue here – the approval of a county budget appropriating funds to Cobb BOE – did not cause Plaintiff's alleged constitutional violation. Plaintiff's Complaint makes clear that the alleged constitutional deprivation was, instead, the result of various discretionary decisions made by Cobb BOE regarding the management of the 2018 election. Related to this lack of causation on the part of

Cobb County is the fact that Cobb County is not the final policymaker with regard to decisions related to the management of an election or the processing of voter registrations and absentee ballots.  Cobb County cannot, therefore, be held liable under § 1983 for allegations based on Cobb BOE's administration of election laws.

2. *Plaintiff cannot show that Cobb County's approval of a budget caused its alleged constitutional violation.*

Plaintiff's Complaint alleges an undue burden on the constitutional right to vote based on allegations related to the mismanagement of the election and the processing of voter registration and absentee ballots. (Doc. 1 at ¶ 11-14). However, as discussed above with regard to the causation prong of the standing analysis, Defendant Cobb County has no role or involvement in the selection of polling places, allocation and maintenance of voting machines, hiring and training of poll workers, and/or the handling of voter registration and absentee ballots. State law vests exclusive authority over these areas to the county election boards, which are the superintendents of elections.  O.C.G.A. 21-2-2(35); 21-2-40; 21-2-70.    Thus, Plaintiff's alleged harm is not traceable to *any* actions or inactions taken by Cobb County (or its Board of Commissioners), but instead was the result

of alleged actions or inactions by Cobb BOE,[4] which is "a unique entity under Georgia law" that administers elections pursuant to state law and "acts as an arm of the state for purposes of conducting elections . . ." *Casey*, 2007 WL 788943 at *7.

Notably, the Complaint fails to even identify a policy or custom executed by Cobb County that violated Plaintiff's constitutional rights.  The Complaint refers vaguely to the County's responsibility for providing "tools necessary for the Boards of Elections to do their jobs" (Doc. 1 at ¶ 8); however, under Georgia law, the governing authority of a county has a limited role with regard to the management of elections: the BOC is simply to appropriate the funds to Cobb BOE that Cobb BOE deems necessary to manage the election.  O.C.G.A.  § 21-2-71.

Moreover, it is Cobb BOE, and not the County (or its Board of Commissioners) that determines how those appropriated funds will be spent for purposes of managing the election.  O.C.G.A. § 21-2-71 requires the governing authority of counties and municipalities to appropriate funds for election-related

---

[4] Defendant Cobb County strongly disputes Plaintiff's allegations regarding alleged problems with Cobb BOE's management of the election; however, for purposes of this Motion to Dismiss, the factual allegations in the Complaint concerning alleged problems with the election must be deemed as true.

costs, including "expenditures and contracts for expenditures *by the superintendent* for polling places" and for "the purchase and printing, *under contracts made by the superintendent,* of all ballots and other election supplies required [by law], or *which the superintendent shall consider necessary to carry out this chapter*" and for maintenance of all voting equipment required by [election law], or *which the superintendent shall consider necessary to carry out this chapter*."   O.C.G.A. § 21-2-71 (emphasis added).  Thus, it is the election superintendent (Cobb BOE) that makes the threshold determination as to what is in fact "necessary" to run the election and what needs to be purchased.[5]

Pretermitting whether a county commission's discretionary budgeting determinations could constitute a policy or custom for purposes of liability under § 1983, no causal link can be shown between a budget allocation to an entity with independent decision-making authority and that entity's subsequent discretionary

---

[5] The Cobb County Purchasing Department arranges for the bidding process; however, it is Cobb BOE that decides on the necessary expenditures and communicates the relevant specifications to the Purchasing Department. Contracts for capital expenditures, which would include the purchase of voting machines, must be approved by the BOC; however, it is Cobb BOE that decides whether additional voting machines are needed and whether to request approval of the capital expenditure from the BOC.  With regard to the 2020 election, neither Cobb BOE nor the BOC will have any role in the purchase of voting machines because the State will make the initial purchase of voting machines and provide them to counties following the adoption of a new Statewide Voting System.  (Eveler Decl. at ¶ 11; O.C.G.A. § 21-2-300.

determinations as to how its money should spent.  Even if additional money had been allocated to Cobb BOE to run the election, that additional funding would not necessarily result in Cobb BOE making different decisions as to the staffing and equipping of polling places or the handling of voter registration and absentee ballots.  The connection between approval of a county budget and Plaintiff's alleged harm is far too attenuated with multiple intervening causal agents (i.e., Cobb BOE's discretionary decisions on how to spend the allocated funds) to support causation under the *Monell* standard.  The "policy or custom of the municipal entity [must be] the moving force behind the constitutional deprivation." *Yates v. Cobb Cty. Sch. Dist.*. 687 F. App'x 866, 872 (11th Cir. 2019) (citing *Monell*, 436 U.S. at 690-694).

Federal courts have consistently rejected § 1983 claims where the plaintiff cannot show that the alleged municipal policy or custom caused the constitutional violation at issue.  *See Turquitt v. Jefferson Cty*., 137 F.3d 1285, 1292 (11th Cir. 1998) (county government not liable for acts of sheriff because it had no power over the administration of the jail; "a local government can only be liable under § 1983 for injuries which the government itself caused, and causation necessarily implies control"); *Vandiver*, 325 F. Supp.3d at 1331 (county not liable for alleged malicious prosecution because "chain of causation between the County and the

alleged injury broke when the district attorney exercised his power to proceed against [plaintiff] by way of a state indictment"); *Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993) (claim under § 1983 "fails for lack of causation" where plaintiff cannot show that failure to inspect or report complaints at jail "caused or contributed to any injury or violation of his constitutional rights").

It is not clear from the Complaint whether Plaintiff is contending that the unspecified "tools" provided by Cobb County to Cobb BOE for purposes of running an election include anything beyond simply the approval of Cobb BOE's submitted budget; however, to the extent that Plaintiff is alleging that Cobb County has a more hands-on role in the management of an election, the allegations are simply erroneous assertions of law. *Ashcroft*, 556 U.S. at 678 ("tenet that a court must accept as true all of the allegations in a complaint is inapplicable to legal conclusions"). With respect to the allegation in Paragraph 3 of the Complaint that the counties "have failed to provide enough polling places, voting machines, and election staff in recent elections," resulting in long lines and delays in processing voter registrations and absentee ballots (Doc. 1 at ¶ 3), Georgia law is clear that the county boards of elections, and not the governing authority of a county, are empowered to select polling places, hire and train staff, and process voter registration and absentee ballots. O.C.G.A. § 21-2-70(4) (superintendent is

authorized "[t]o select and equip polling places for use in primaries and elections"); § 21-2-70(6)&(8) (power of superintendent to appoint and instruct poll workers); 21-2-99 (superintendent charged with training poll officers and workers); § 21-2-226 (county board of registrars charged with voter registration); § 21-2-384 (superintendent in charge of processing absentee ballots).

With regard to the duty to provide equipment, the law requires *the State* to purchase and furnish to the counties the voting machines, and the law requires the *county election boards* to purchase the other voting equipment and supplies. O.C.G.A. § 21-2-300; § 21-2-70(5). Because the State has adopted a new Statewide Voting System, with brand new equipment, the counties will have no role in the procurement of the voting machines to be used in the 2020 elections -- such will be purchased and provided to the counties by the State.  O.C.G.A. § 21-2-300(a)(1).  With regard to purchases of voting supplies other than voting machines, the law makes clear that those decisions are made by the election superintendent, i.e., the county boards of election.  O.C.G.A. § 21-2-71.

Thus, the County has no legal authority to engage in any of the activities referenced in Paragraph 3, and, therefore, the only "tool" provided by the Board of Commissioners to Cobb BOE is the approval of Cobb BOE's budget, which, as explained above, did not cause Plaintiff's alleged harms.

### 3. Cobb County is not the final policymaker regarding the management of an election, neither does it have authority or control over Cobb BOE.

This Court has stated that "[c]ertainly," a county board of elections "acts as an arm of the state for purposes of conducting elections . . ." *Casey*, 2007 WL 88943 at *8.[6]  While this Court reached this conclusion in the context of an analysis concerning the applicability of the Eleventh Amendment to a county board of election (which had been named as a party defendant), this Court's discussion in *Casey* makes clear that Cobb County does not control Cobb BOE or have final policymaking authority over Cobb BOE's decisions regarding the management of the election.  As an arm of the state (with regard to its election-related functions), Cobb BOE is analogous to a sheriff or a district attorney over which the County has no authority or control.  *Grech*, 335 F.3d at 1348 ("The counties' lack of authority and control over sheriffs explains why counties have no § 1983 liability); *Owens*, 877 F.2d at 951 (district attorney "act[s] on behalf of the state when exercising his discretion in prosecutorial decisions.")

In concluding that there is "little doubt that Eleventh Amendment immunity

---

[6] *Casey* involved Title VII and § 1983 claims based on the county election board's recommendation to the county commission on the selection of a director.  This Court held that it was a much "more murky" question as to whether or not a county election board acts as an arm of the state when it makes employment decisions, as opposed to when it manages an election. *Casey*, 2007 WL 788943 at * 9.

would [apply]" to a county board of election, this Court explained that state law makes clear that it is the State, and not the county, that controls a county election board:

> *The Board of Elections was created by the Georgia General Assembly pursuant to its statutory authority*, and vested with broad powers to manage the conduct of elections on behalf of the state . . . *To that end, the State exercises significant control over the Board's election-related activities. The state fixes the duties of the Board . . . establishes the minimum qualifications for Board members . . . sets certification and minimum training requirement*s *see* O.C.G.A. § 21-2-100 (requiring at least one member of county board of elections or designee of board to attend minimum 12 hours training annually as selected by [the] Secretary of State, and providing that Secretary of State, in his or her sole discretion, may waive certification requirement in whole or part).

*Casey*, 2007 WL 788943 at *8 (emphasis added).

This Court stated that a county's control over the board of elections is "generally attenuated," and that even with respect to its budgeting role, the county's authority is constrained by state law: "[T]he Court questions the true extent of the County's budgetary authority in light of the county's apparent obligations under state law regarding the conduct of elections. . ." *Id*.

Federal courts in other jurisdictions have agreed with this Court's conclusion in *Casey* that local elections boards act on behalf of the State, and not

36

the local counties, in their management of an election. For example, in *McConnell v. Kilgore*, 829 F.2d 1319, 1327 (4th Cir. 1987), the Fourth Circuit ruled that a Virginia county election board was an arm of the state because "local governing bodies have no measurable control over the appointment, discharge, compensation, duties, or policies of the electoral boards." In describing state control over the election board, the Fourth Circuit emphasized that Virginia law establishes a State Election Board that "has the power to promulgate regulations establishing and governing the duties of the electoral boards" and that state law dictates the qualifications and oath taken by registrars. *Id.*

The reasoning of *Kilgore* applies equally here because Georgia law has provisions that are virtually identical to the Virginia laws cited by the Fourth Circuit. *See* O.C.G.A. § 21-2-30, 21-2-3(1) (creating State Election Board with duty to "promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials"); O.C.G.A. § 21-2-70, § 21-2-74 (establishing duties and qualifications of superintendent and requiring an oath); 21-2-214 (qualifications and oaths of registrar). *See also Hunter v. Hamilton Bd. of Elections*, 850 F. Supp.2d 795, 801 (S.D. Ohio 2012) (county election board "functions as an arm of the State with respect to its review and counting of

provisional ballots," but ruling that election board had waived its Eleventh Amendment immunity by belatedly asserting the defense after defending the suit on the merits).

Because Plaintiff has not sued Cobb BOE, this Court need not address the availability of Eleventh Amendment immunity to Cobb BOE at this time.[7]  *See Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311, 321-322 (4th Cir. 2009) (dismissing § 1983 claim against county governing authority based on actions taken by county social services board where state and not the county controlled board, but stating that issue of board's ability to assert Eleventh Amendment immunity is "not before [the Court] because plaintiffs did not name the Social Service Board as a defendant.").  However, the analysis in the Eleventh Amendment cases demonstrates that Cobb County cannot be the final policymaker with regard to the election-related matters at issue in this litigation.

"Actions the County is liable for [under § 1983] should also be those it has the authority to remediate." *Vandiver*, 325 F.Supp.3d at 1332.  Cobb County has no authority to remediate any of Plaintiff's concerns regarding the selection and staffing of polling places, the maintenance and allocation of voting machines, the

---

[7] If Cobb BOE is added as a party, it reserves its right to assert Eleventh Amendment immunity at that time.

length of the lines, or the processing speeds for voter registration and absentee ballots. Cobb County's inability to address any of these alleged problems demonstrates that it has no control or authority over Cobb BOE's management of the election and thus cannot be liable for the alleged constitutional violations.

### D. The Requested Injunction is an Invalid "Obey the Law" Injunction.

Even if Plaintiff had pled an actionable claim under § 1983 (which it has not), the relief sought – an injunction requiring "Defendants to take all necessary actions in advance of the 2020 elections to protect voters by informing and improving their election procedures" [Doc. 1 at p. 8] – would be unenforceable. Federal Rule 65(d)(1) requires that an injunction "state its terms specifically" and describe in "reasonable detail" "the act or acts restrained or required." Fed. R. Civ. P. 65(d). The Eleventh Circuit has made clear that an injunction, like that sought here, requiring a defendant to "comply with the Constitution" is "the archetypical and unenforceable 'obey the law' injunction." *Walker v. Calhoun, Georgia*, 682 Fed.Appx 721, 724 (11th Cir. 2017) (injunction requiring city to "implement post-arrest procedures that comply with the Constitution" was invalid because it provided "no guidance" on what was required); *see also Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531-1532 (11th Cir. 1996) (vacating injunction that required the defendant to stop discharges in violation of the Clean Water Act).

"[T]he primary problem with obey-the-law injunctions is that they often lack the specificity required by Rule 65(d)." *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012).  The specificity requirements of Rule 65(d) are "'designed to prevent uncertainty and confusion on the part of those faced with injunctive orders and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *Id.* (internal citations omitted).  Thus, Plaintiff cannot obtain an injunction that requires the defendants to implement unspecified "constitutional" election procedures, without specifying what those are.

With respect to Plaintiff's request that an injunction require Defendants to "publicly announc[e] the steps taken to provide sufficient resources for the Boards of Election to run a proper election in 2020" (Doc. 1 at p. 8), Cobb County's only "step" will be to approve a budget, which will include an appropriation for Cobb BOE.  The BOC is planning to vote on the FY 2020 budget on or around July 23, 2019, after the last of three public hearings on the proposed 2020 budget.  (Eveler Decl. at  ¶ 15).  Finally, an injunction that requires Defendants to provide "enough" polling places, voting machines, and elections staff to prevent voters from having to wait in "unreasonably" long lines (Doc. 1 at p. 8) would also violate Rule 65's specificity requirements because the meanings of "enough" and "unreasonable" are unclear.  Of course, such an injunction would also be

unenforceable because Defendant Cobb County has no legal authority to select and equip polling places or to hire elections staff.

## IV. CONCLUSION

WHEREFORE, Cobb County requests that it be dismissed from this action, that judgment be entered in Defendant's favor, that all costs be cast upon Plaintiff, and that said Defendant have such other and further relief as this Court deems appropriate.

## CERTIFICATE OF TYPE STYLE

This document was prepared using Times New Roman 14-point font.

Respectfully submitted this 18th day of April, 2019.

COBB COUNTY ATTORNEY'S OFFICE
Attorney for Defendant Cobb County

By:*/s/Elizabeth Ahern Monyak*
   ELIZABETH AHERN MONYAK
   Sr. Associate County Attorney
   State Bar No. 005745
   LAUREN S. BRUCE
   Sr. Associate County Attorney
   State Bar No. 796642
   H. WILLIAM ROWLING, JR.
   Assistant County Attorney
   State Bar No. 617225
   DEBORAH L. DANCE
   County Attorney
   State Bar No. 203765

100 Cherokee Street, Suite 350
Marietta, GA  30090
770-528-4000 (phone)
770-528-4010 (facsimile)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA SHIFT,                          *
                                        *
        Plaintiff,                      *       CIVIL ACTION NO.
                                        *       1:19-cv-01135-AT
v.                                      *
                                        *
GWINNETT COUNTY,                        *
FULTON COUNTY,                          *
DEKALB COUNTY, and                      *
COBB COUNTY,                            *
                                        *
Defendants.                             *

## CERTIFICATE OF SERVICE

It is hereby certified that I have this day electronically filed with the Clerk

and served a true and correct copy of **Defendant Cobb County's Brief in Support**

**of Motion to Dismiss** by using the CM/ECF system which will automatically send

e-mail notification of such filing to the following attorneys of record:

Angela Liu                              Neil Alan Steiner
Dechert LLP-IL                          Dechert LLP-NY
Suite 3400                              1095 Avenue of the Americas
35 West Wacker Drive                    New York, NY  10013
Chicago, IL  60601


Dale E. Ho                              Sean Young
NAACP Legal Defense                     American Civil Liberties Union
And Education Fund, Inc.                Foundation of Georgia, Inc.
99 Hudson Street                        P.O. Box 77208
16th Floor                              1100 Spring St., N.W., Ste. 640
New York, NY  10013                     Atlanta, GA  30357

Sophia Lin Lakin
American Civil Liberties
Union Foundation-NY
18th Floor
125 Broad Street
New York, NY  10004

Bennett Davis Bryant
Shelley Driskell Momo
Dekalb County Law Department
5th Floor
1300 Commerce Drive
Decatur, GA  30030

Brian P. Tyson
Taylor English, LLP
1600 Parkwood Circle
Suite 200
Atlanta, GA  30339

Kaye Burwell
Cheryl Ringer
David R. Lowman
Fulton County Attorney's Office
141 Pryor Street, SW Suite 4038
Atlanta, GA 30303

This 18th day of April, 2019.

COBB COUNTY ATTORNEY'S OFFICE
Attorneys for Defendant

By: */s/Elizabeth Ahern Monyak*
ELIZABETH AHERN MONYAK
Senior Associate County Attorney
State Bar No. 005745

100 Cherokee Street, Suite 350
Marietta, GA  30090
770-528-4000 (Phone)
770-528-4010 (Facsimile)