**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| GEORGIA SHIFT, LYNN BRINDELL, VELMA LAMBERT, AND NYOTA EDJIDJIMO<br><br>Plaintiffs<br><br>vs.<br><br>GWINNETT COUNTY, GWINNETT COUNTY BOARD OF REGISTRATION AND ELECTIONS, FULTON COUNTY, FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS, DEKALB COUNTY, DEKALB COUNTY BOARD OF REGISTRATION AND ELECTIONS, COBB COUNTY, and COBB COUNTY BOARD OF ELECTIONS AND REGISTRATION<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.:<br>1:19-CV-01135-AT |

## FIRST AMENDED COMPLAINT

Plaintiffs Georgia Shift, Lynn Brindell, Velma Lambert, and Nyota Edjidjimo, by and through the undersigned attorneys, file this First Amended Complaint, and allege upon knowledge as to its own conduct and upon information and belief as to the conduct of others, as follows:

## THE NATURE OF THE CASE

1.  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). As the Supreme Court recognized in *Wesberry*, the right to vote and to have that vote counted is a fundamental constitutional right for all United States citizens.

2.  In Georgia, it is the responsibility and obligation of both the county governments and their boards of elections to ensure that there are sufficient polling places, voting machines, and election staff to properly administer elections.

3.  Gwinnett, Fulton, DeKalb, and Cobb Counties (the "Counties" or "County Defendants") are the four most populous counties in Georgia, with more than 2.2 million of Georgia's 6.6 million registered voters. The Counties have failed to provide their respective boards of elections enough polling places, voting machines, and elections staff, among other things, resulting in voter disenfranchisement that undermines our democracy.

4.  Gwinnett County Board of Registration and Elections, Fulton County Board of Registration and Elections, DeKalb County Board of Registration and Elections, and Cobb County Board of Elections and Registration (the "Boards of Elections" or the "BOE Defendants," and with the County Defendants, the

"Defendants") are the respective Boards of Elections for each County.  The Boards of Elections are charged with the responsibility of running the day-to-day operations of elections, and their failures to do so properly have resulted in the oppression of voters' sacred, constitutional right to vote.

5.     Unpreparedness for elections can trigger and has triggered unreasonably long lines – taking voters four hours or more to cast a ballot – that result in an undue burden on the right to vote.

6.     The Counties and Boards of Elections have also failed to provide sufficient elections staff, which leads to the delayed processing of absentee ballot applications and absentee ballots, resulting in outright disenfranchisement of absentee voters who did not receive their ballots in the mail until it was too late to vote.

7.     Though the State bears its own responsibility for enacting and enforcing laws and policies that protect the fundamental right to vote, the widespread operational problems described above are directly traceable to the actions and/or inactions of the four Counties and Boards of Elections.  That is because under current Georgia law, each individual county is ultimately responsible for approving and providing the resources (e.g., polling places, voting machines and elections staff) required to run and operate elections, and the boards

of election, in turn, are responsible for properly running the day-to-day operations of elections.

8.    As described further below, each County's Board of Elections has failed to determine, request, vet, and provide sufficient facilities, and voting equipment, which has resulted in unreasonably long lines and has even prevented citizens from casting their votes—an obvious and foreseeable consequence. Likewise, the Counties have failed to determine, approve, and provide sufficient resources for elections, preventing their Boards of Elections from carrying out their statutory and constitutional mandates.  In failing to carry out their responsibilities and obligations, Defendants caused harm, and will continue to cause harm, of constitutional proportions.

9.    The Counties have attempted to evade their responsibilities, by, for example, blaming past problems on higher than expected voter turnout.  But the very term "high-turnout election"—those in which approximately 57% of registered voters attempt to cast a ballot—is a cynical misnomer.  Counties are *constitutionally required* to ensure that all elections do not result in widespread burdens on the right to vote, and should strive for turnout exceeding that of what the Counties have labeled "high turnout elections" to be the norm.

10.     History has shown that, absent Court intervention, nothing will change and confirms the fundamental, systemic burdens, and unfairness of the voting system in the Counties.  For example, as demonstrated in various Board of Elections meeting minutes prior to the 2018 election, the Boards of Elections were fully aware of issues relating to inadequate training of poll workers and high turnout of voters, and yet they did nothing.  As a result, they remained unprepared for the election and failed to administer the election properly.  A Court order is necessary to ensure that the Counties and their Boards of Elections will voluntarily take corrective actions that they previously refused to take.

11.     If the Court waits until the Counties approve election budgets for 2020, or waits until the 2020 elections themselves occur to adjudicate this matter, it will be too late to protect the fundamental right to vote.  Given the imminence of the 2020 elections, there will not be ample opportunity later to remedy these failures. Without intervention from the Court, voters will continue to be disenfranchised—an injury that money cannot compensate.  Public interest will be served by ensuring that voters have the opportunity to vote and have their votes actually counted.

## JURISDICTION AND VENUE

12.     This action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.  Accordingly, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

13.     Venue in this Court is proper under 28 U.S.C. § 1391 because the events giving rise to Plaintiffs' claims arose in this district and division.  All Defendants are located within this district and division.

## PARTIES

**A.     Organizational Plaintiff**

14.     Plaintiff Georgia Shift is a civic organization based out of Augusta, Georgia that gives marginalized young people, including young people of color, a seat at the table of democracy through electoral action, hands-on education, and civic media programs.  In the most recent election, Georgia Shift was active in assisting voter registration and get-out-the-vote efforts in the Counties. Georgia Shift is committed to increasing political engagement in young people.  By knocking on doors, speaking to young voters about important issues on the ballot, passing out informational pamphlets, visiting universities to help students request absentee ballots, and giving rides to polls on election day, Georgia Shift seeks to

engage young people on legislative issues, civic education, and policy that impacts them.

**B.    Individual Plaintiffs**

15.    Plaintiff Lynn Brindell is a resident of Fulton County.  She faced delays and difficulties with voting in the 2018 election due to machine malfunctions.  She and her husband went to vote during the early voting period at the Chastain Park recreational center, but as they approached the front of the line and were allowed into the room to vote, ***all*** of the voting machines went down. She and her husband, who was suffering from stage 4 cancer, sat and waited for approximately 20 minutes, but the machines were still down.  When Ms. Brindell asked how long the wait would be, or if they could go somewhere else to vote, poll workers informed Ms. Brindell and her husband that they didn't know how long the wait would be, and that it appeared machines were down across multiple polling locations, so they left.  Ms. Brindell was forced to take time out of her day the next day to vote.

16.    Plaintiff Velma Lambert is a resident of Gwinnett County.  She faced inordinate delays due to long lines and machine malfunctions when she voted in the 2018 election.  When she went to vote at Evangel Community Church, she was forced to wait in line for approximately ***three hours***.  Ms. Lambert witnessed

elderly individuals who had difficulty standing in line for such a long time; she also witnessed several people leave without voting because the line was too long. When she finally went into the polling place to vote, she found that only two machines were operational. And the machine Ms. Lambert used was malfunctioning. To this day, Ms. Lambert cannot be sure that the machine accurately accounted for her vote.

17. Plaintiff Nyota Edjidjimo is a resident of Gwinnett County. She is currently attending school in Miami, Florida and was unable to vote in the 2018 election due to the improper processing of her absentee ballot request. She completed an online request for an absentee ballot, which was rejected for reasons connected with her signature. The rejection letter was sent to her parent's house despite providing clear instruction on the application that correspondence should be sent to her address in Florida. She eventually received notice of the rejection and resubmitted her application. She verified that her second application was received and accepted but she never received her ballot.

## C.    Defendants

18. Defendants Gwinnett County, Fulton County, DeKalb County, and Cobb County are county governments. Each County is responsible for providing

its respective Board of Elections with sufficient resources to ensure they can properly administer elections.

19. Defendants Gwinnett County Board of Registration and Elections, Fulton County Board of Registration and Elections, DeKalb County Board of Registration and Elections, and Cobb County Board of Elections and Registration are the Boards of Elections for each respective county.

## FACTUAL ALLEGATIONS

20. The recent example of the November 2018 election confirms the fundamental, systemic burdens, and unfairness of the voting system in the Counties. The November 2018 elections were plagued with problems that placed inexcusable and unjustifiable burdens on the right to vote in the Counties.

21. Pursuant to OCGA § 21-2-71, each County is required to "appropriate annually and from time to time … the funds that it shall deem necessary for the conduct of primaries and elections." The County Defendants failed to provide adequate funds to manage effectively the November 2018 election.

22. Similarly, pursuant to OCGA § 21-2-70, each Board of Elections is statutorily responsible for running the day-to-day operations of elections; this includes, but is not limited to, the following duties: "[t]o select and equip polling places;" "purchase … and maintain election equipment … and all other supplies

for primaries and elections;" "appoint poll officers and other officers to serve in primaries and elections;" "make and issue such rules, regulations, and instructions, consistent with law, including the rules and regulations promulgated by the State Election Board, as … deem[ed] necessary for the guidance of poll officers, custodians, and electors;" "instruct poll officers and others in their duties;" "inspect systematically and thoroughly the conduct of primaries and elections … [so that] primaries and elections may be honestly, efficiently, and uniformly conducted;" and "prepare annually a budget estimate of … expenses." The BOE Defendants failed to administer properly the November 2018 election.

23. As detailed below, Defendants' failings were manifest in numerous ways during the November 2018 elections, including (1) a lack of polling places and inadequate staffing, leading to inexcusably long lines; (2) lack of functioning voting machines and inadequate supplies; and (3) slow processing of registration and absentee ballot applications.

24. Due to Defendants' failures, Georgia Shift must now divert resources towards ensuring that voters are able actually to cast a ballot and have it counted, to compensate for Defendants' failures to run and fund a proper election. These resources are diverted away from activities that seek to increase voter turnout and organize individuals to build political power, towards ensuring that the current

system can handle even the existing level of turnout.  For example, in the month of October 2018, one-third of Georgia Shift's full-time staff was forced to divert 100% of their time from organizing-related work to solely election-related work.

25.    Furthermore, the delayed processing of absentee ballot applications and absentee ballots and long lines during the November 2018 election forced Georgia Shift to divert precious staff time and other resources from its organizing work leading up to the 2019 legislative session and redirect those limited resources towards elections.  Georgia Shift helped submit at least hundreds of absentee ballot applications for the November 2018 election.  Due to the delayed processing of these applications, Georgia Shift was forced to follow up with the individual counties—including County Defendants—repeatedly to see whether they had processed the application or sent out an absentee ballot yet.  Georgia Shift should not be required to divert its funding to combat the effects of Defendants' failures properly to fund and run elections and the resulting disenfranchisement of Georgia voters in the 2020 general election.

26.    Furthermore, in the absence of relief, the Individual Plaintiffs and the citizens who Georgia Shift aims to serve will also suffer serious and irreparable injury in the form of unlawful disenfranchisement in upcoming elections.

## A.     Polling Places & Long Lines

27.     Thousands of Georgian voters, including the Individual Plaintiffs, faced severe burdens in trying to cast ballots at their respective polling places.[1] These burdens stemmed from issues relating to inadequate staffing, site selection, or other logistical problems at the polling places, which led to unreasonably long lines with waits of up to four hours or more at polling places located in each County.

28.     For example, on Election Day in 2018, Rev. Jesse Jackson rushed to Fulton County in response to long lines at a polling place in order to encourage people not to leave.[2]

29.     Forcing voters to stand in line for unreasonable lengths of time is inexcusable.  For many voters, an hours-long wait to vote is simply not a realistic option.  Some voters must return to work so that they could earn a livelihood. Others are unable to wait in lengthy lines due to familial obligations, such as the

---

[1] *LIVE VOTING UPDATES: Polls are closed — at least most of them*, The Atlanta Journal-Constitution (Nov. 6, 2018), https://www.ajc.com/news/state--regional-govt--politics/live-updates-georgians-head-the-polls/DtYWWHcxngbl4SdVaDAyDL/.
[2] Becca Godwin, *Jesse Jackson: Issue at Fulton precinct is 'classic voter suppression'*, The Atlanta Journal-Constitution (Nov. 6, 2018), https://www.ajc.com/news/local/problem-precincts-reported-fulton-county-turnout-steady/fPobN87GTle4jWkPtEfmdL/.

need to care for their children. For other voters, such as elderly individuals, waiting in long lines puts their very health at risk. Indeed, there are innumerable reasons a voter cannot stand in line for unreasonable periods of time, leaving them with no option but to depart the polling place without voting.

30.    These are not hypothetical or isolated incidents. On Election Day 2018, one organization alone received calls on its hotline or observed through its poll observers approximately 640 complaints from electors in Gwinnett County, 1432 complaints from those in Fulton County, 1159 complaints from those in DeKalb County, and 536 complaints from those in Cobb County, ranging from issues including, but not limited to, long lines, and machine malfunctions.

31.    Defendants have thus failed to provide their respective boards of elections enough polling places and elections staff, among other things, and/or run the day-to-day operations of elections. The myriad of problems voters faced at their polling places, including the long lines due to unpreparedness and refusal properly to plan for and fund elections in 2018, demonstrate an obvious breakdown in the voting system that is unjustifiable.

**B.    Voting Machines & Other Election Equipment**

32.    In addition to facing hours-long waits at polling places, voters faced further barriers to the ballot in the form of lack of basic supplies, including

insufficient numbers of voting machines and/or voting machines that were broken or malfunctioning.

33.   These issues represent a complete failure on the part of Defendants to fulfill their obligations under the Code, which requires Boards of Elections using these machines to do the following:

- "examine each unit before it is sent to a polling place, verify that each registering mechanism is set at zero, and properly secure each unit so that the counting machinery cannot be operated until later authorized," OCGA § 21-2-379.6(a);

- three days before every election, "have each DRE [Direct-Recording Electronic voting machine] unit tested to ascertain that it will correctly count the votes cast for all offices and on all questions," OCGA § 21-2-379.6(c);

- "require that each DRE unit be thoroughly tested … prior to the delivery of each DRE unit to the polling place," OCGA § 21-2-379.7(b);

- "[p]rior to opening the polls each day[,] … certify that each unit is operating properly and is set to zero…." OCGA § 21-2-379.7(b); and

- "[e]nsure that each DRE unit's tabulating mechanism is secure throughout the day during the primary or election," OCGA § 21-2-379.7(d)(3).

34.     Defendants' failure effectively to plan for, manage, and provide the necessary resources for the election is apparent in their failure to ensure the provision of an adequate number of machines—let alone *working* machines—to accommodate the number of registered voters in the Counties.

35.     For example, some polling places did not have necessary power cords.  Failure to provide power cords meant many machines were taken out of commission throughout the day, leaving too few working machines and causing unnecessary delays.

36.     Reports from Fulton County revealed that at one polling center, four out of five machines were down because of a lack of power cords, with hundreds of people still in line.  Voters were told to leave and come back later.[3]

37.     Likewise, in Gwinnett County, inadequate preparation meant that when machines ran out of battery power early in the morning, the polling center was shut down while workers left to retrieve power cords that had been forgotten; this resulted in a ***three hour*** long wait for voters on Election Day 2018.[4]

---

[3] *LIVE VOTING UPDATES: Polls are closed*, supra n. 1.
[4] Michael King & Nick Sturdivant, *Gwinnett Co. voters wait for hours after workers forget power cords for the voting machines*, 11 Alive (Nov. 7, 2018). https://www.11alive.com/article/news/politics/elections/gwinnett-co-voters-wait-for-hours-after-workers-forget-power-cords-for-the-voting-machines/85-611764666.

38.     This is an example of how Defendants have failed properly to provide their respective boards of elections enough voting machines, among other things, and/or run the day-to-day operations of elections.  The Counties created and contributed to this problem by failing to plan for and allocate the necessary funds required for elections, including sufficient funding to purchase and/or repair voting machines.  And the Defendants created and contributed to this problem by failing to provide a sufficient number of voting machines, and failing to ensure that the machines provided to the polling places actually functioned.

39.     The fact that the Governor recently signed the 2019 Georgia Laws Act 24 (H.B. 316) that, among other changes, institutes a new system to replace the DREs with newer machines does not cure the impending injury to Plaintiffs and voters in the Counties.  Regardless of which machines are used, the BOE Defendants have a responsibility to ensure that enough machines are available, the machines are properly functioning, the staff is properly trained with regard to the machines, and that items such as power cords are maintained and available on Election Day.  Defendants have failed to satisfy these responsibilities in the past, and merely purchasing new technology will not redress these failures.

40.     In fact, the introduction of new machines will require additional training on how they function, how voters will use them, and, if necessary, how to fix them—training that will be entirely new to all involved and will surely be accompanied with growing pains.  But, as shown above, history teaches us that Defendants have been unwilling to do the hard work associated with ensuring that the voting machines functioned on Election Day, ensuring that a sufficient number of machines are provided to each polling place, and ensuring that there are enough polling places to alleviate the long lines associated with the limited number of machines.  The mere introduction of new machines is thus no cure-all, and Defendants' failure properly to provide for and administer voting machines and other equipment must be remedied now.

## C.     Absentee Ballots

41.     Defendants' failure properly to provide their respective boards of elections enough elections staff and/or run the day-to-day operations of elections, is in part manifest in the maladministration of absentee ballots in 2018. According to BOE Board Minutes, news reports, and other sources, voters in the Defendant Counties experienced extraordinary delays and difficulties with respect to absentee ballots in the Counties, caused by Defendants' lack of preparedness.

42. The inordinate delays in the processing of absentee ballot applications caused some voters to receive their absentee ballot after Election Day 2018. Further, in order for a vote to count, the absentee ballot must be received—not just post-marked—by Election Day 2018, and the inordinate delays in the processing of absentee ballot applications caused many voters to receive absentee ballots with too little time left for them to be received by Election Day 2018.

43. For example, according to September 13, 2018 DeKalb County BOE Board Minutes, the DeKalb County BOE recognized months before Election Day that it had "40,000 registration applications to process" and was receiving over "500+ absentee applications per day to be processed." Despite the large number of registration and absentee ballot applications, and despite having many months to prepare, DeKalb County and its BOE failed to provide and fund the necessary staff and equipment required to process these applications.

44. Less than two weeks before Election Day 2018, approximately 4,700 registered voters who had submitted absentee ballot applications in DeKalb County still had not received their ballots.[5]

---

[5] Raisa Habersham, *Ga. Democrats allege missing absentee ballot applications in DeKalb*, The Atlanta Journal-Constitution (Oct. 26, 2018), https://www.ajc.com/news/local/democrats-allege-missing-absentee-ballot-applications-dekalb/H2YfMR6zOoY4CmRYXETyZM/.

45. Even with notice that additional staffing and other resources were needed to administer the upcoming election, the DeKalb BOE still did not do enough to oversee the election properly, nor did the County properly fund the resources necessary to administer the election, evidencing a reasonable likelihood that in the future, the DeKalb BOE and DeKalb County will fail to administer and fund elections appropriately.

46. Additionally, further evidencing the DeKalb BOE's lack of preparedness, some DeKalb County residents who opted to vote in person instead of submitting an absentee ballot were told they had already voted when they arrived at the polls on Election Day. Other voters never received their absentee ballots at all despite applying for them well ahead of Election Day.[6]

47. One example of this confusion and failure to timely process absentee ballot applications is the case of a DeKalb resident—an out of state college student—who attempted to vote via absentee ballot, but never received one. To make sure her vote counted, the student drove for ten hours to Georgia on Election

---

[6] Ben Brasch & Raisa Habersham, *'Multiple' DeKalb absentee voter issues arise on Election Day*, The Atlanta Journal-Constitution (Nov. 6, 2018), https://www.ajc.com/news/local/multiple-dekalb-absentee-voter-issues-arise-election-day/FqgnCqHjjrnAz5sZfd84WP/.

Day 2018, only to be told her voter profile said she had already voted when she had not, so she was forced to vote with a provisional ballot.[7]

## D.     Knowledge of the Issues & Insufficient Response

48.    To provide the necessary tools to ensure citizens are able to exercise their right to vote, the Counties must provide sufficient resources.    DeKalb County's 2018 Elections and Registration budget was $4,460,098[8]; Cobb County's was $3,183,300[9]; Fulton County's was $8,174,260[10]; and Gwinnett County's was $7,892,250.[11]  For the 2018 election, the County Defendants' election budgets were wholly insufficient, as evidenced by the unpreparedness and failure to provide the tools necessary to administer the election.

49.    These election failures, however, came as no surprise to Defendants and are indicative of a widespread practice that imposes a severe burden and inequity on the right to vote.  In fact, Defendants compounded the operational problems.

50.    For example, according to its July 30, 2018 BOE Board Minutes, Cobb County constituents raised concerns with Cobb County BOE officials that a

---

[7] *Id.*
[8] FY 2019 Budget, DeKalb County, Georgia, at 169 (Feb. 26, 2019).
[9] FY 2019/2020 Biennial Budget, Cobb County, Georgia, at 15.
[10] 2019 Final Adopted Budget, Fulton County, Georgia, at 18 (Jan. 23, 2019).
[11] FY 2018 Budget Resolution Summary, Gwinnett County, Georgia, at 2.

voting emergency plan was necessary as early as July 2018. Yet Cobb County and Cobb County BOE's inadequate actions caused widespread operational problems. Their failure to act even in the face of their constituents' concerns highlights the need for this Court's intervention.

51.     According to its September 21, 2018 Board Minutes, Gwinnett County BOE also had "total numbers for active and inactive voters" provided to it as well as for "voter registration" data entry numbers as early as September 2018. Even a need for "heavy overtime due to the unanticipated turnout" was noted just a month in advance of the election by Gwinnett County BOE. Yet, despite this knowledge of the turnout, Gwinnett County and its BOE was still unprepared for the election.

52.     In an attempt to meet high voter registration needs, DeKalb County BOE similarly required its staff to work long hours in the weeks leading up to the elections—14-16 hour days, including weekends starting in mid-September. Even then, according to its November 16, 2018 BOE Board Minutes, DeKalb County only gave voters two weeks' notice that additional advance voting sites were being added for the runoff election. Such notice, particularly in light of the Board's awareness of a high turnout in the several weeks leading up to the election, is a wholly insufficient response.

53.     Even though DeKalb County was well aware of its growth in voter registration, according to its September 13, 2018 BOE Board Minutes, DeKalb County BOE recommended only three advance voting sites be opened for the entire three-week period and only opened an additional seven locations the week prior to the election.

54.     Similarly, according to its December 13, 2018 BOE Board Minutes, the Fulton County BOE knew not only that it was experiencing increased voter registration, but that it had roughly 80 less polling locations than previously, approximately a 30% decrease.  Following the 2018 election, the Fulton County BOE acknowledged that it knew it should provide more information to voters, but it was concerned "if voters will continue to read" if such information was added to its Head of Households letter, since it would lengthen the letter.  Such a speculative concern cannot justify the BOE's failure to provide the County voters with the information they need to exercise their constitutional right to vote.

55.     As demonstrated in its December 4, 2018 BOE Board Minutes, the Fulton County BOE was also aware of issues relating to parking at a polling location; issues with its and the Secretary of State's website regarding voter information; constituent complaints regarding absentee mail procedures and unmarked polling locations; that it needed more staff to accommodate the number

of registered voters in the county; and "a large number of complaints from voters in and out to the county [sic]" regarding the "Secretary of State's office policies and procedures." Yet, despite this awareness, there appear to be no meaningful plans set in place to ensure that voters will not run into similar issues in future elections.

56. As the failings in the 2018 elections show, absent a direction from the Court to take all necessary actions in advance of the 2020 elections—including, for example, adjusting turnout prediction and budgeting formulas to prepare for turnout, hiring enough staff to reform and improve processing time of registration and absentee ballot applications, selecting sufficient polling places, increasing the number of voting machines and ensuring that those machines properly function, along with other reforms—Georgia Shift will suffer imminent and irreparable injury to its mission and the Counties' citizens, along with the Individual Plaintiffs, will continue to experience disenfranchisement.

57. County Boards of Elections failed properly to plan for and address these problems, and the Counties failed to evaluate and provide the funds required to prevent these problems. More fundamentally, since the 2018 election, Defendants have failed to undertake meaningful efforts to improve the functions of the election system to ensure that these problems do not reoccur.

58.     Because Defendants have not demonstrated a pattern of commitment to providing proper election services, Defendants' election violations are reasonably expected to recur, and Georgia Shift has and will continue to divert resources from specific services in order to protect the right to vote.

**CAUSE OF ACTION**

*Violation of the Fundamental Right to Vote under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983*

59.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

60.     The Fourteenth Amendment protects the fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Pursuant to the *Anderson-Burdick* line of cases, the government cannot infringe upon the right to vote without adequate justification; the greater the magnitude of the infringement, the stronger the justification must be. When the burden on the right to vote is severe, the challenged regulation must advance a compelling state interest. *See Burdick*, 504 U.S. at 434.

61.     The practices outlined above impose a severe burden—outright disenfranchisement—on the right to vote. Defendants' failure to provide their elections staff with the tools necessary to run an election resulted in extremely long lines on Election Day 2018 and failures to timely process registration forms,

absentee ballot applications, and absentee ballots, resulting in unreasonable and severe burdens on the right to vote.  There continues to be little indication thus far that Defendants intend to resolve these pervasive problems, which will continue unless the Court intervenes.  Plaintiffs will again be exposed to all the same injuries they have suffered in the past if Defendants again do not account for turnout and resolve these pervasive problems.  This conduct constitutes at least a serious burden on the right to vote.

62.    Defendants have failed to assert any "legitimate state interests of sufficient weight" that would justify the burdens imposed on Plaintiffs.  *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318-19 (11th Cir. 2019) ("A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest.  And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden.") (internal citations omitted).

63.    This systemic pattern of inaction, sanctioned and carried out by Defendants, reflects neither "episodic election irregularity," nor "issues of inadvertent error."  *See Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980); *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978).

64. In light of the various violations described above, Defendants have violated and continue to violate the First and Fourteenth Amendment's protections against undue burdens on the right to vote. Absent a direction from the Court to take all necessary actions in advance of the 2020 elections to protect voters by reforming and improving polling locations, polling machines, and processing and provision of absentee ballots, and/or absent permanent injunctive relief, the Individual Plaintiffs will suffer imminent and irreparable injury to their fundamental right to vote and Georgia Shift will suffer imminent and irreparable injury to its core mission, including the disenfranchisement of Georgia Shift's constituents, for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following:

(a) That this Court issue a judgment declaring that Defendants have violated the Fourteenth Amendment to the United States Constitution;

(b) That this Court direct Defendants to take all necessary actions in advance of the 2020 elections to protect voters by reforming and improving their election procedures to comply with the Fourteenth Amendment and applicable laws, including, but not limited to, publicly announcing the steps taken to provide sufficient resources for the Boards of Elections to properly administer elections in

2020 and beyond, any other such action that may be necessary to not burden voters and their right to vote;

(c)     That this Court issue an injunction prohibiting Defendants from conducting or authorizing the conduct of any public election without requiring the BOE Defendants to evaluate and provide enough polling places; examine the number of voting machines needed to avoid delays, including any new machines, and provide enough functioning machines at polling places; evaluate current and anticipated staffing needs and hire and train sufficient elections staff to prevent voters from having to wait in unreasonably long lines on Election Day 2018, and that will allow elections officials to process all registration forms and absentee ballot applications within one day of receipt, where any harm that Defendants might suffer due to an injunction is outweighed by the harm that disenfranchised voters would suffer absent court intervention;

(d)     Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing Order;

(e)     That Plaintiffs be awarded attorneys' fees under 42 U.S.C. § 1988;

(f)     That all costs of this action be taxed against Defendants; and

(g) That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

Dated: May 30, 2019

Respectfully submitted,

*/s/ Neil A. Steiner*_____

Neil A. Steiner*
Dechert LLP
Three Bryant Park,
1095 Avenue of the Americas
New York, NY 10036
212-698-3822 (phone)
neil.steiner@dechert.com

Angela M. Liu*
Melanie C. MacKay*
Dechert LLP
35 West Wacker Drive,
Suite 3400
Chicago, IL 60601
(312) 646-5816 (phone)
angela.liu@dechert.com
melanie.mackay@dechert.com

Sean J. Young (Ga. Bar No. 790399)
American Civil Liberties Union
Foundation of Georgia, Inc.
P.O. Box 77208
Atlanta, GA 30357
770-303-8111 (phone)
770-303-0060 (fax)
syoung@acluga.org

Sophia Lin Lakin*
Dale E. Ho*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
212-519-7836 (phone)
slakin@aclu.org
dho@aclu.org

*admitted Pro hac vice

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that I have read the Court's Standing Order in Cases Proceeding Before the Honorable Amy Totenberg and that I will comply with its provisions during the pendency of this litigation.

*/s/ Neil A. Steiner*

# CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system (which document was prepared in Times New Roman font, 14-point type, one of the font and point selections approved by the Court in N.D. Ga. L.R. 5.1(C)), which will automatically send e-mail notification of such filing to all attorneys of record.

Date: May 30, 2019

*/s/ Neil A. Steiner*